**United States District Court**
For the Northern District of California

1
2
3
4
5                              UNITED STATES DISTRICT COURT
6                             NORTHERN DISTRICT OF CALIFORNIA
7
8    IN RE                                        No. C-14-5161 EMC
9    SIGNET SOLAR, INC.,                          No. C-14-5162 EMC
10             Debtor.
11   _____/
12   ANDREA A. WIRUM, Trustee,                    **ORDER ON APPEAL**
13             Appellant,
14        v.
15   PRABHAKAR GOEL, *et al.*,
16             Appellee.
17   _____/
18   ANDREA A. WIRUM, Trustee,
19             Appellant,
20        v.
21   BHUPENDRA B. PATEL,
22             Appellee.
23   _____/
24        Currently pending before the Court are two appeals of bankruptcy adversary proceedings.
25   The debtor in bankruptcy (Chapter 7) was the company Signet Solar, Inc. ("Signet").  The trustee for
26   Signet filed claims for relief against two of Signet's founders and members of the board of directors,
27   namely, Prabhakar Goel and Bhupendra B. Patel.  According to the trustee, Mr. Goel and Mr. Patel
28   breached their fiduciary duties to Signet.  The trustee also asked that any claims of Mr. Goel (and an

**United States District Court**
For the Northern District of California

1  affiliated company) and Mr. Patel against Signet be equitably subordinated because of their alleged

2  misconduct.  The bankruptcy court granted Mr. Goel and Mr. Patel's motions to dismiss and denied

3  leave to amend.  The trustee now appeals that order.

4  ## I.  FACTUAL & PROCEDURAL BACKGROUND

5  As a formal matter, there are two complaints filed by the trustee – one against Mr. Goel (and

6  an affiliated company) and one against Mr. Patel.  The complaints, however, are substantially the

7  same.  For convenience, the Court largely cites to the allegations in the Goel complaint.

8  As alleged, Signet was a company "formed in 2006 to market a new form of thin-film silicon

9  panel to the solar photovoltaic industry. . . . Signet developed, manufactured, and deployed the

10 world's largest thin-film silicon photovoltaic modules, lowering the cost of installed solar arrays

11 without the use of toxic or rare materials."  FAC (Goel) ¶ 10.  Signet itself was a holding company.

12 It operated its manufacturing and sales activities through a wholly owned German subsidiary, which

13 shall hereinafter be referred to as "German Signet."  FAC (Goel) ¶ 11.  Both Mr. Goel and Mr. Patel

14 were founders of Signet as well as members of the company's board of directors.  In fact, Mr. Goel

15 was the chairman of the board.  *See* FAC (Goel) ¶ 8; SAC (Patel) ¶ 8.

16 From the outset, Signet had a specific business plan.  Initially, Signet's manufacturing

17 facility (owned by German Signet) would be operated at 20 megawatt production levels "until it

18 obtained a foundation of customers and orders which would allow it to expand to 40 megawatt

19 production."  FAC (Goel) ¶ 16.  It was expected that Signet would have a negative cash flow,

20 "which would only turn positive upon the upgrade of its manufacturing facility to a 40 megawatt

21 production level."  FAC (Goel) ¶ 17.  "[T]o reach this capacity, . . . additional capital would need to

22 be raised from investors, and . . . Signet would need to maintain [a] Bank of America line of credit at

23 a level in excess of $15,000,000."  FAC (Goel) ¶ 17.  Signet had a line of credit with Bank of

24 America in the amount of $16,500,000.  As a formal matter, the line of credit was taken out in the

25 names of the company's founders, but Signet guaranteed the line of credit.  *See* FAC (Goel) ¶ 14.

26 Although in liquidation terms Signet was formally insolvent at all relevant times (*i.e.*, if

27 liquidated, its liabilities would exceed its assets), *see* FAC (Goel) ¶ 19, the company was as a

28 practical matter successful, securing over $30 million in equity financing by 2008.  *See* FAC (Goel)

2

¶ 13.  By October 2009, Signet began to look for additional outside investment in order to advance funds to German Signet, which, as noted above, owned and operated Signet's manufacturing facilities.  "The purpose of the cash infusion was to provide funds to German Signet to pay current obligations and to allow German Signet to begin the process of increasing its manufacturing plant to 40 megawatt capacity."  FAC (Goel) ¶ 18.

In October 2009, Signet received funding proposals backed by two different entities, EMCO Group and NCM Strategic Partners, LLC.  *See* FAC (Goel) ¶¶ 21-22.  Both of these proposals "required the founding shareholders, including Goel and Patel, to make certain concessions, including an agreement to extend the due dates on loans made by the founders to Signet."  FAC (Goel) ¶ 25.  On November 8, 2009, at a Signet board meeting, Mr. Goel and Mr. Patel suggested an alternative sponsored by themselves.  *See* FAC (Goel) ¶ 26.

On November 12, 2009, EMCO delivered a new funding proposal to Signet.  Under the EMCO term sheet, EMCO would "provide financing to Signet totaling $12,500,000 from EMCO and $4,000,000 from other investors pursuant to a Series C stock offering."  FAC (Goel) ¶ 27.  Mr. Goel and Mr. Patel, however, did not approve of the EMCO term sheet because it "would have subordinated loans made by Goel and Patel to Signet, would have changed control of the board of directors and would have required the resignations of Goel and Patel from the board of directors."  FAC (Goel) ¶ 27.

On November 17, 2009, another Signet board meeting was held, where management recommended approval of the EMCO term sheet.  Mr. Goel and Mr. Patel voiced opposition and again proposed an alternative.  More specifically, Mr. Goel and Mr. Patel proposed that they would provide $4,000,000 in cash to the company and thereafter raise an additional $16,000,000 from other investors.  *See* FAC (Goel) ¶ 32.  On November 22, 2009, Mr. Goel circulated the Goel/Patel term sheet for consideration.  *See* FAC (Goel) ¶ 35.  On November 23 or 24, 2009, Signet held another board meeting, without Mr. Goel and Mr. Patel being present, and classified the Goel/Patel term sheet as secondary.  *See* FAC ¶ 37.

On November 27, 2009, German Signet gave notice to the German government (as required by German law) that it was insolvent.  German Signet had to cure the insolvency within three weeks

or it would have to begin insolvency proceedings (again, as required by German law).  German Signet needed approximately $5 million to cure the insolvency.  *See* FAC (Goel) ¶¶ 36, 39.

On December 3, 2009, the Signet board met yet again, this time with all members present.  At that meeting, the board ultimately agreed to the Goel/Patel term sheet (over the EMCO term sheet), largely based on Mr. Goel and Mr. Patel's "unqualified promise to each contribute $2,000,000 to Signet to cover its immediate needs."  FAC (Goel) ¶ 42.  "A key part of the board's decision to accept the Goel and Patel proposal was the fact that it provided much needed short term funding in the form of Patel and Goel's agreements to each loan $2 Million to the company."  FAC (Goel) ¶ 43.

Although Mr. Goel fully funded his $2 million promise, *see* FAC (Goel) ¶ 63, Mr. Patel did not – instead advancing only $300,000.  *See* FAC (Goel) ¶ 64.  Mr. Patel knew or should have known that he could not fund the full $2 million at the time of his promise.  Moreover, Mr. Goel knew or should have known the same at the time of his promise because Mr. Patel had been heavily borrowing from Mr. Goel.  *See* FAC (Goel) ¶¶ 45-46, 93.  Furthermore, on December 19, 2009, Mr. Patel explicitly advised Mr. Goel that he could not fund the $2 million to Signet.  *See* FAC (Goel) ¶ 58.

In the meantime, Signet circulated a detailed description of a Series C Preferred Stock offering (technically, a convertible debt offering).  *See* FAC ¶¶ 50, 53.  The Series C solicitation stated that "the purpose of the solicitation was to raise funds to meet Signet's equity obligations sufficient to trigger a German government grant critical to the facility upgrade, as well as providing Signet sufficient capital to qualify for lease financing for the 40 megawatt upgrade."  FAC (Goel) ¶ 52.  German Signet's success was key to Signet's success because, in December 2009, "Signet's only asset other than its bank account balances, was its investment in German Signet."  FAC (Goel) ¶ 44; *see also* FAC (Goel) ¶ 19 (alleging that, "at the November 8, 2009 meeting of the Signet board of directors, the company reported cash of only $27,000 and $4.4 million dollars of delinquent (German Signet) accounts payable").  However, as of December 2009, "Signet's investment in German Signet was worthless unless Signet carried out its Business Plan, because all of Signet's loans to German Signet were subordinate to grants made by the German government (approximately

**United States District Court**
For the Northern District of California

25 million Euros) to German Signet." FAC (Goel) ¶ 44. Ultimately, the Series C solicitation secured $3,238,000 in investment by January 2010. *See* FAC (Goel) ¶ 54. Most of the funding came from friends and associates of the founders. *See* FAC (Goel) ¶ 55.

Signet treated the $3 million as a loan and then loaned those funds to German Signet, but later Signet was told that the funds loaned were not enough to avert German Signet's insolvency. *See* FAC (Goel) ¶¶ 54, 61-62, 65, 100. On January 25, 2010, Signet informed German Signet that it would not be able to provide the necessary additional funds. *See* FAC (Goel) ¶ 68. Subsequently, Mr. Goel contacted German Signet and falsely stated that Signet did have more funds. *See* FAC (Goel) ¶ 70.

Throughout this time, Mr. Goel was motivated to maintain control of Signet and/or keep Signet "propped up" because he had another venture, Gold Solar Energy, LLC, which had applied for a permit to build a solar farm in the state of Nevada, and, in the attempt to secure approval of the permit, he falsely represented to the state that Gold Solar had a ready supply of solar units pursuant to a joint agreement with Signet. There was in fact no such agreement with Signet. *See* FAC (Goel) ¶¶ 82-85, 92. Mr. Goel was also motivated to get funds to German Signet and keep it "propped up" so that he could divert its inventory to his own solar farm companies at below cost. *See* FAC (Goel) ¶ 101. Mr. Patel went along with Mr. Goel, apparently because he was indebted to Mr. Goel – Mr. Patel had both heavily borrowed and sought investment funds from Mr. Goel. *See* FAC (Goel) ¶ 93.

In February 2010, Mr. Goel learned that he had failed to get Nevada's approval for the permit. Thereafter, he and Mr. Patel began to withdraw financial support from Signet. *See* FAC (Goel) ¶ 72. Mr. Goel and Mr. Patel even went so far as to reduce the Bank of America line of credit from $16,500,000 to $7,000,000. *See* FAC (Goel) ¶ 73. They also withdrew investor checks that had been delivered to Signet but not yet cashed. *See* FAC (Goel) ¶ 74.

In March 2010, EMC offered Signet a new term sheet pursuant to which it EMCO agreed to inject 13 million Euro into Signet and German Signet, conditioned on German Signet not transferring or encumbering its intellectual property. *See* FAC (Goel) ¶ 75. But because Mr. Goel and Mr. Patel refused to provide any more funds to Signet – including the balance of the $2 million that Mr. Patel had previously promised to provide – Signet was "forced to enter into an agreement to

United States District Court

For the Northern District of California

1   lease all of the intellectual property of German Signet to raise immediate funds to pay German

2   Signet's short term obligations." FAC (Goel) ¶ 78. This led to the withdrawal of the EMCO term

3   sheet and the collapse of Signet and German Signet. *See* FAC (Goel) ¶ 79.

4       In essence, the trustee claims that the actions of Mr. Goel and Mr. Patel led Signet to incur

5   debt in excess of $3,238,000 (*i.e.*, the Series C funding) that it would not have otherwise incurred.

6   *See* FAC (Goel) ¶¶ 100, 110. To the extent the $3 million was a benefit to Signet, the trustee claims

7   that Signet was not afforded the full benefit of that money because that money went to German

8   Signet and then Mr. Goel essentially poached inventory from German Signet. Finally, the trustee

9   claims that the actions of Mr. Goel and Mr. Patel resulted in a loss to Signet's "enterprise value."

10  FAC (Goel) ¶ 110.

11      Mr. Goel and Mr. Patel both moved the bankruptcy court to dismiss the operative complaints

12  asserted against them. A hearing was held before the bankruptcy court on November 6, 2014. At

13  the hearing, the court dismissed with prejudice, concluding that the trustee had failed to adequately

14  plead causation/damages.

## II.   DISCUSSION

A.   Legal Standard

17      There is no dispute that the claims asserted by the trustee against Mr. Goel and Mr. Patel are

18  adversary proceedings. The Federal Rules of Bankruptcy Procedure specify that Federal Rule of

19  Civil Procedure 12(b) applies in adversary proceedings. *See* Fed. R. Bankr. P. 7012(b). Under Rule

20  12(b)(6), a defendant may move to dismiss for failure to state a claim for relief.

> "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." The plausibility standard requires more than the sheer possibility or conceivability that a defendant has acted unlawfully. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Dismissal under Rule 12(b)(6) is proper only when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory.

United States District Court

For the Northern District of California

1   *Li v. Kerry*, 710 F.3d 995, 999 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79

2   (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

3       This Court applies de novo review in assessing the bankruptcy court's order granting Rule

4   12(b)(6) dismissal.  *See In re Fine*, 158 Fed. Appx. 898, 898 (9th Cir. 2005); *In re Zimmer*, 313 F.3d

5   1220, 1222 (9th Cir. 2002).

6   B.    <u>Breach of Fiduciary Duty</u>

7       1.    <u>Causation/Damages</u>

8       The parties do not seem to dispute that the trustee's claim of breach of fiduciary duty is made

9   pursuant to Delaware law.[1]  Under Delaware law, "[t]he elements of breach of fiduciary duty that

10   must be proven . . . by the plaintiff are (i) that a fiduciary duty exists; and (ii) that a fiduciary

11   breached that duty."  *Heller v. Kiernan*, No. 1484-K, 2002 Del. Ch. LEXIS 17, at *18 (Del. Ct. Ch.

12   Feb. 27, 2002).  However, in order for the plaintiff to recover, the plaintiff must also show that the

13   breach of fiduciary duty caused it damage.  *See, e.g.*, *Grace Bros., Ltd. v. Uniholding Corp.*, No.

14   Civ. A. 17612, 2000 Del. Ch. LEXIS 101, at *54 (Del. Ch. July 12, 2000) (stating that "the court can

15   fashion an award of monetary damages that holds the defendant-directors accountable for any *and*

16   *only* the harm that their breaches of fiduciary duty may have caused the plaintiffs").  The trustee

17   does not argue otherwise; in fact, she agrees.  *See, e.g.*, Reply (Goel) at 4 ("The Trustee does not

18   disagree that damage is an element of the claim.").

19       What the trustee does argue is that she adequately alleged causation and damages in the

20   operative complaints.  More specifically, the trustee claims that Signet was harmed as a result of Mr.

21   Goel and Mr. Patel's actions because: (1) Signet lost enterprise value (even if technically it was

22   insolvent, *i.e.*, in liquidation terms); (2) Signet incurred debt (more than $3 million) that it otherwise

23   would not have incurred (*i.e.*, through the Series C solicitation); and (3) any benefit that Signet got

24   from the $3 million was lost because at least part of that money was diverted by Mr. Goel from

25

26       [1] *See also* Cal. Corp. Code § 2116 (providing that "[t]he directors of a foreign corporation

27   transacting intrastate business are liable to the corporation, its shareholders, creditors, receiver, liquidator or trustee in bankruptcy for . . . [any] violation of official duty according to any applicable

28   laws of the state or place of incorporation or organization, whether committed or done in this state or elsewhere").

United States District Court

For the Northern District of California

1   German Signet (*i.e.*, inventory was diverted to Mr. Goel to use for his other solar business).  The

2   Court addresses each of these arguments in turn.

3        On the first argument, the Court proceeds with the assumption that the term "enterprise

4   value" means the value of a company as a going concern.  That is the meaning that the trustee seems

5   to have assigned the term, as reflected in the bankruptcy hearing transcript.  *See*, *e.g.*, Tr. at 13

6   (counsel for the trustee arguing that "the enterprise value that we will establish at trial is going to be

7   based on the yearly evaluations that were prepared by professionals for the coproration that said

8   what the company's enterprise value was, the most recent one of which was 30 million dollars"); Tr.

9   at 14 (counsel for trustee arguing that "[Signet] had enterprise value while still operating"); Tr. at 34

10  (counsel for the trustee arguing that "the company and its German Signet had established a sufficient

11  basis of customers to trigger the [business] plan for increased – and in furtherance of that, they were

12  raising more money, so the company is still a vital company").  Based on this understanding of the

13  term, the Court agrees with the trustee that, just because a company is insolvent in liquidation terms

14  (*i.e.*, liabilities are greater than assets), that does not necessarily mean that the company does not

15  have any enterprise value.  In fact, even if an insolvent company is forced into bankruptcy, that still

16  does not automatically mean that the company lacks enterprise value.  For example, a company may

17  be reorganized in bankruptcy (Chapter 13).  That being said, the Court cannot say that, in the instant

18  cases, the trustee has adequately pled a loss of enterprise value as a result of Mr. Goel and Mr.

19  Patel's actions.

20       As the bankruptcy court indicated, the trustee's contention that Signet had enterprise value

21  which was lost depends on there being a viable alternative to the Goel/Patel deal – an alternative

22  which would have kept Signet a going concern.  But, as the bankruptcy court noted, the EMCO and

23  NCM deals were not viable alternatives because each deal required Mr. Goel and Mr. Patel to

24  subordinate the loans they had previously made to Signet, and neither had a fiduciary duty to

25  subordinate.  The trustee has not disputed this point in her papers, and therefore the situation Signet

26  was facing was either take the Goel/Patel deal or reject it.  If Signet had rejected the Goel/Patel deal,

27  then it would have gone out of business because German Signet was its main asset and German

28  Signet would go out of business without any additional funding from Signet.  Thus, in the absence of

**United States District Court**
For the Northern District of California

1    the Goel/Patel deal, it is not possible to say that Signet had any enterprise value to lose; in the

2    absence of the deal, Signet could not be a going concern.  Notably, the trustee did not ever allege

3    that a reorganization under Chapter 11 would have been possible in the absence of the Goel/Patel

4    deal.  In short, absent from the record are any facts suggesting some plausible scheme by which

5    Signet could have value as a going concern.

6           The Court now turns to the second argument – *i.e.*, that Signet was harmed because it

7    incurred more debt than it otherwise would have as a result of Mr. Goel and Mr. Patel's actions.

8     As a preliminary matter, the Court rejects Mr. Goel's suggestion that "deepening insolvency" can

9    never be a harm.  Admittedly, in *In re Troll Communications, LLC*, 385 B.R. 110 (D. Del. 2008), the

10   bankruptcy court did state that, in *In re CitX Corp., Inc.*, 448 F.3d 672 (3d Cir. 2006), "the Third

11   Circuit . . . rejected the use of deepening insolvency as a theory of damages," *Troll*, 385 B.R. at 122,

12   but the *Troll* court seems to have mischaracterized the Third Circuit's statements in *CitX*.  In *CitX*,

13   the Third Circuit simply noted that "'[t]he deepening of a firm's insolvency [was] not *an*

14   *independent form* of corporate damage.'" *CitX*, 448 F.3d at 678 (emphasis added).  It was in this

15   context that the appellate court stated: "'Where an independent cause of action [such as breach of

16   fiduciary duty] gives a firm a remedy for the increase in its liabilities, the decrease in fair asset

17   value, or its lost profits, *then the firm may recover*, without reference to the incidental impact upon

18   the solvency calculation.'" *Id.* (emphasis added).

19          The Court notes, however, that "the [mere] incurrence of debt by itself cannot deepen a

20   company's insolvency."  *In re Parmalat Secs. Litig.*, 501 F. Supp. 2d 560, 578 (S.D.N.Y. 2007).

21   The district court in *Parmalat* explained why:

22                      When, for example, a company borrows cash and receives the
                   full amount of the loan, it receives an asset that directly offsets the
23                 newly incurred liability on its balance sheet.  In other words, the
                   company "expand[s] debt in *precise* proportion – dollar-for-dollar
24                 proportion – to the expansion of assets in the form of new cash.  The
                   difference between the company's assets and liabilities therefore
25                 remains the same.  Its ability to pay its debts as they become due is no
                   worse; indeed, it may be better.  The company's insolvency is no
26                 greater than before.

27   *Id.* at 574 (emphasis in original).

28          The *Parmalat* court continued:

United States District Court

For the Northern District of California

> The point is that a company's insolvency is not deepened simply by the incurrence of new debt where the company suffers no loss on the loan transaction. The insolvency is deepened when, for example, the proceeds of the loan are squandered or assets otherwise are looted. It is at that point that the gap between liabilities and assets widens and the ability to service outstanding debt is impaired.

*Id.* at 574-75.[2]

The Court finds the reasoning of the *Parmalat* court sound. Therefore, to the extent the trustee claims harm to Signet simply by virtue of the $3 million debt that was incurred, that is not enough to constitute an injury because, in fact, there was a corresponding benefit (*i.e.*, cash) that Signet received.

This leads the Court to the third argument presented by the trustee, namely, that to the extent Signet got a benefit from the $3 million loan, that loan was then "wasted" by Mr. Goel because, even though that money was loaned to German Signet, Mr. Goel ended up diverting German Signet's inventory to the benefit of his independent solar business. As indicated above, this is a viable claim of harm for the very reasons explained by the *Parmalat* court. In this regard, the bankruptcy court's point that the $3 million would not have existed but for Mr. Goel and Mr. Patel's misrepresentations in the first place may be true; but that does not mean that that $3 million still was not wasted. This is in contrast to the situation in *CitX*:

> Assuming for the sake of argument that [the defendant accountant] Detweiler's financial statements allowed CitX to raise over one million dollars, that did nothing to "deepen" CitX's insolvency. Rather, it lessened CitX's insolvency. Before the equity infusion, CitX was $2,000,000 in the red . . . . With the added $1,000,000 investment, it was thereby insolvent only $1,000,000. This hardly

---

[2] The *Parmalat* court also provided further examples of where the incurrence of debt could actually cause harm to a company. For example:

- "'to the extent that bankruptcy is not already a certainty, the incurrence of debt can force an insolvent corporation into bankruptcy, thus inflicting legal and administrative costs on the corporation'";
- "'[a]side from causing actual bankruptcy, deepening insolvency can undermine a corporation's relationships with its customers, suppliers, and employees'"; and
- "'prolonging an insolvent corporation's life through bad debt may simply cause the dissipation of corporate assets.'"

*Parmalat*, 501 F. Supp. 2d at 575 (quoting *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 349-50 (3d Cir. 2001)).

United States District Court

For the Northern District of California

1 | deepened insolvency.  Any increase in insolvency (*i.e.*, the several
2 | million dollars of debt incurred after the $1,000,000 investment) was wrought *by CitX's management*, not by Detweiler.

3 | *CitX*, 448 F.3d at 677 (emphasis added).  Here, the claim is that assets were effectively diverted

4 | from Signet by Mr. Goel.

5 | In his papers, Mr. Goel protests that the trustee has failed to explain how he could have

6 | diverted the inventory "given that he was not an executive with operational control over either

7 | Signet or German Signet."  Opp'n (Goel) at 24.  But at this point in the proceedings, it is not

8 | implausible that Mr. Goel could have caused the diversion of inventory given his position at Signet

9 | and the fact that Signet was funding German Signet.  At the very least, the diversion allegations in

10 | the operative complaints would make a dismissal with prejudice – as the bankruptcy court ordered –

11 | improper because, even if more specificity were needed in the complaints, that does not thereby

12 | mean that the claims for breach of fiduciary duty were futile.

13 | In his papers, Mr. Patel seems to assert that there could be harm to Signet only if Signet had

14 | some assets to begin with, which it did not.  *See, e.g.*, Opp'n (Patel) at 15 (arguing that "the Debtor

15 | was worth *nothing* and owned *nothing* of any value before the purported breaches of fiduciary

16 | duty[;] [i]t was not and could not be damaged any further").  But Mr. Patel has not cited any

17 | authority in support of this position.  Moreover, he has not explained why an increase in liability

18 | should not be considered a harm to the company – even if the company had no assets – at least in a

19 | situation where, as here, it is alleged that the benefit concurrent with that liability (*i.e.*, the $3 million

20 | raised through the Series C solicitation or at least a portion thereof) was ultimately wasted.

21 | That being said, the Court does note that, as to Mr. Patel at least, it is not clear to what

22 | extent, if any, he had a hand in the alleged waste of the $3 million.  The operative complaint against

23 | Mr. Patel appears to be silent as to whether Mr. Patel was involved with diverting inventory from

24 | German Signet to the benefit of Mr. Goel.  However, at the very least, the trustee should be given an

25 |
26 |
27 |
28 |

United States District Court
For the Northern District of California

1   opportunity to amend, if she can do so in good faith, to plead allegations regarding Mr. Patel's

2   involvement.[3]

3         2.   Business Judgment Rule

4         Mr. Goel contends that, even if the trustee adequately pled causation and damages in the

5   operative complaint against him, her claim for breach of fiduciary duty still warrants dismissal

6   because of the business judgment rule.[4]  The business judgment rule "'is a presumption that in

7   making a business decision, the directors of a corporation acted on an informed basis, in good faith

8   and in the honest belief that the action taken was in the best of the company.'" *Benihana of Tokyo,*

9   *Inc. v. Benihana, Inc.*, 906 A.2d 114, 120 (Del. 2006); *see also* 8 Del. C. § 144(a) (providing that

10  "[n]o contract or transaction between a corporation and 1 or more of its directors or officers . . . shall

11  be void or voidable solely for this reason . . . if: (1) the material facts as to the director's or officer's

12  relationship or interest and as to the contract or transaction are disclosed or are known to the board

13  of directors or the committee, and the board or committee in good faith authorizes the contract or

14  transaction by the affirmative votes of a majority of the disinterested directors").

15        For purposes of this opinion, the Court assumes that the business judgment rule is a defense

16  that may be made by individual directors on a company board and not just the board *qua* board (as

17  the bankruptcy court indicated at the hearing before it).  *See* Tr. at 23-24, 26 (bankruptcy court

18  stating that the rule "protects a Board as a Board acting as a Board" and not "an individual member

19  of a Board from deceiving his own company").  But even with this assumption, Mr. Goel's position

20  lacks merit.  To the extent he argues that a majority of the disinterested board members approved the

21  ————————————————

22  [3] Although the Court is reversing the bankruptcy court for the reasons stated above, it is not
    making any determination as to whether the trustee can adequately establish causation/damages on
23  the merits.  For example, there seems to be an argument that, even if the $3 million was not wasted
    and put to the use it should have been (*i.e.*, fully to the benefit of German Signet and not also Mr.
24  Goel), German Signet still would have failed because the $3 million was not enough to get it out of
    insolvency; therefore, Signet still would have failed as well since German Signet was its main asset.
25  The trustee has asserted that the funds would *not* have been transferred to German Signet, *see, e.g.*,
    Mot. (Goel) at 12 (suggesting that it was pointless to send funds to German Signet "which was
26  hopelessly insolvent and could not survive unless Goel and Patel fulfilled their pledge to provide
    financial backing"), but that contention seems problematic – indeed, sustaining German Signet
27  appears to have been the whole point of the Series C solicitation.  This issue, however, is not
    properly resolved on a motion to dismiss.

28        [4] This argument has been raised by Mr. Goel alone.

United States District Court
For the Northern District of California

1    Goel/Patel deal, that may be true, but the trustee has implicitly asserted that the disinterested board

2    members were not presented with all material facts regarding the deal, including the fact that Mr.

3    Goel had a conflicting vested interest in keeping Signet and German Signet alive (*i.e.*, to assist his

4    solar farm project in Nevada and to get the benefit of German Signet's inventory at below cost).  Mr.

5    Goel contends that the trustee failed to allege, in the operative complaint, that the disinterested board

6    members lacked this knowledge, but that is a fair inference that may be made.  *See, e.g.*, FAC (Goel)

7    ¶ 86 (alleging that "Signet knew nothing of Goel's [Nevada] Fish Springs Project venture").  At the

8    very least, the trustee should have been given an opportunity to amend to clarify the point.

9            To the extent Mr. Goel argues that the distribution of the $3 million in funds from Signet to

10   German Signet was also an act protected by the business judgment rule, there is a similar problem.

11   That is, as above, there is a fair inference based on the allegations in the operative complaint that the

12   disinterested board members lacked knowledge that Mr. Goel intended to use German Signet for his

13   own personal benefit.

14           Accordingly, the Court declines to dismiss the breach of fiduciary claim against Mr. Goel on

15   the basis of the business judgment rule.

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

C.       Equitable Subordination

Finally, the Court addresses the claims for equitable subordination.  The bankruptcy court dismissed the claims for equitable subordination because it dismissed the claims for breach of fiduciary duty.  *See* Tr. at 43 (bankruptcy court stating the "subordination of the claim goes hand in hand with the first count [for breach of fiduciary duty]").  Because the Court is now reversing the bankruptcy court on the claims for breach of fiduciary duty, it also reverses on the claims for equitable subordination.  To the extent Mr. Goel and Mr. Patel have asserted that the trustee has failed to allege any harm to creditors, this contention is problematic for reasons similar to those discussed above regarding harm to Signet.

### III.    CONCLUSION

For the foregoing reasons, the Court reverses the bankruptcy court and remands for further proceedings consistent with this order.

The Clerk of the Court is instructed to enter judgment in favor of the trustee and close the file in this case.

IT IS SO ORDERED.

Dated:  June 9, 2015

_____
EDWARD M. CHEN
United States District Judge

United States District Court
For the Northern District of California

14